# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARYAM BALBED,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **PJM 16-193** |
| | * | |
| **EDEN PARK GUEST HOUSE, LLC,** *et al.*, | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

Maryam Balbed has sued Eden Park Guest House, LLC ("Eden Park") and three individuals—Etty-Bela Mukendi ("E. Mukendi"), Bruno Mukendi ("B. Mukendi"), Trezila Mukendi ("T. Mukendi")—alleging their failure to pay her minimum and overtime wages in violation of the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"); the Maryland Wage and Hour Law, Md. Code, Lab. & Empl. § 3-401 *et seq.* ("MWHL"); the Montgomery County Minimum Wage Law, Montgomery Cty. Code § 27-67 *et seq.*; and the Maryland Wage Payment and Collection Law, Md. Code, Lab. & Empl. § 3-501 *et seq.* Following discovery, the parties filed cross-motions for summary judgment. While the Court initially granted Defendants' Cross-Motion for Summary Judgment and denied that of Plaintiff, that was not the end of the matter.

Balbed timely appealed and the Fourth Circuit reversed and remanded the case for further findings. After additional discovery, the parties have again moved for summary judgment. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Balbed's Motion for Summary Judgment, ECF No. 83, and **DENIES** Defendants' Cross-Motion, ECF No. 84.

1

I.

The basic facts of this case are largely undisputed and well chronicled. From July 2015 to February 2016, Balbed served as an innkeeper at Eden Park, a nine-room bed and breakfast in Takoma Park, Maryland. When she was hired, Balbed signed an employment agreement ("Agreement") with E. Mukendi, on behalf of Eden Park, whereby Eden Park agreed to pay Balbed $800 cash per month and to provide a bedroom, private bathroom, laundry facilities, utilities, and daily breakfast "at no cost."[1] ECF No. 83-4. In exchange, Balbed agreed to manage and clean Eden Park, performing according to a weekly schedule as follows:

**II. Work Hour Schedule**

| Breakfast | Guest Room and common area cleaning | Check-in Time and closing |
|---|---|---|
| Monday:7:30am- 8:30am | OFF (As Needed) | |
| Tuesday; 7:30am-8:30am | 10am-2pm | Check-in time from |
| Wednesday; 7:30am-8:30am | 10am-2pm | 4pm to 9:30 PM |
| Thursday; 7:30am-8:30am | 10am-2pm | Closing @10pm everyday |
| Friday; 7:30am-8:30am | 10am-2pm | Unless otherwise specified. |
| Saturday; 8:30am- 9:30am | 10am-4pm | |
| Sunday;  8:30am- 9:30 | OFF (As Needed) | |

*Note: Cleaning hours are flexible; innkeeper can make his/her own schedule according to check-ins and check-outs with manager approval.

*Id.* The Agreement also made Balbed responsible for checking and replying to emails, maintaining Eden Park's social media accounts, answering phones, and attending to guest inquiries. However, no time was allotted for those activities.

Compensable Hours

The parties sharply dispute Balbed's compensable hours under the Agreement. Defendants maintain that she was only required to work 29 hours per week, the time allotted for preparing breakfast and cleaning guest rooms. *See id.* According to Defendants, all other tasks at Eden Park necessitated a "de minimis" amount of time and, on many days, Balbed did not need to clean guest

---

[1] The Agreement did not set out the value of any of the non-cash accommodations.

rooms at all. Thus, in Defendants' view, the 29-hour estimate was a fair approximation of her schedule. But even if Balbed had worked more hours in a given week, Defendants claim her compensable time was limited to 29 hours pursuant to 29 C.F.R. § 785.23—which permits employers to contract "reasonable" agreements with live-in employees to determine their compensable hours. Under § 785.23:

> An employee who resides on his employer's premises on a permanent basis . . . is not considered as working all the time he is on the premises. . . . It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

*Id.*

Balbed, on the other hand, contends that the Agreement was anything but reasonable. She submits that her duties required as many as between 71 and 112 hours per week. In particular, she claims that the Agreement required her to work every day from 4:00 p.m. to 10:00 p.m. (including off-days), during which she supposedly checked guests in and closed up the inn at night. Those activities allegedly accounted for 42 hours per week, leading in total to a 71-hour workweek. That, she says, entitles her to the minimum wage for any time between 29 and 40 hours per week and time and a half for any hour worked over 40.

<u>Balbed's Compensation</u>

The parties also dispute the remuneration Balbed received during her employment (apart from $800 cash). Because "wages" may include "the reasonable cost . . . of furnishing [the] employee with board, lodging, or other facilities," Defendants seek a credit against Balbed's wages for the value of in-kind benefits provided to her, including lodging, meals, and other amenities. 29 U.S.C. § 203(m)(1). Balbed maintains, however, that Defendants are due no offset because those benefits were furnished in violation of § 203(m) and its implementing regulations. Specifically,

she alleges that her lodging did not comply with local law, in violation of 29 C.F.R. § 531.31, and that Defendants failed to maintain accurate records of the costs of providing her benefits, in violation of 29 C.F.R. § 516.27(a). No party disputes that without wage credit, Balbed was not paid a minimum wage, let alone overtime premiums.

Procedural History

In the first round of motions for summary judgment this Court deemed the Agreement reasonable under § 785.23 and determined that Balbed's total compensable time was 29 hours per week. Relying in part on *Myers v. Baltimore County*, 50 Fed. App'x 583 (4th Cir. 2002), the Court concluded that Eden Park's compliance with § 785.23 dispensed with the need to assess whether the Agreement also satisfied 29 U.S.C. § 203(m) and its implementing regulations. Accordingly, Defendants were held entitled to wage credit for the value of in-kind benefits. After the Court concluded that, all things considered, Balbed was paid well above the minimum wage, the Court granted summary judgment in favor of Defendants. Balbed timely appealed.

On appeal, the Fourth Circuit held that in-kind benefits, such as Balbed's, must satisfy § 203(m) and its implementing regulations to qualify for wage credit—even when an employment agreement is deemed reasonable under § 785.23. That is because, according to the Fourth Circuit, section 785.23 provides only "a limited exception to the general requirement that an employee must be compensated for all hours actually spent at work." *Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285, 290 (4th Cir. 2018). Although the exception "allows employers and employees to reach a 'reasonable agreement' regarding the number of hours presumptively worked," it "has no bearing on an employer's obligations under § 203(m) when supplementing cash wages with in-kind compensation like board or lodging." *Id.*

On remand, this Court was directed to determine:

4

(1) the hours Balbed actually worked, including whether the Agreement was reasonable under 29 C.F.R. § 785.23 in light of all pertinent facts;

(2) whether Balbed's lodging complied with federal, state, and local law under 29 C.F.R. § 531.31;

(3) the cost of any in-kind compensation provided to Balbed, including whether Defendants have reasonably reconstructed their records under 29 C.F.R. § 516.27; and

(4) whether Maryland and county wage laws are preempted by 29 C.F.R. § 785.23.

<u>Additional Discovery</u>

Following the Fourth Circuit's remand, the parties engaged in limited discovery, "including time for Defendants to attempt to reconstruct records pertaining to the amount of wages—in cash and kind—paid to Plaintiff, and for both Plaintiff and Defendants to assess the nature of, and value of, the living quarters Plaintiff occupied during her employment with Defendants." ECF No. 57 at 1. The parties engaged experts to assess these issues.

Balbed retained architect Scott W. Sterl, who reported on her bedroom's compliance with relevant codes and regulations. *See* ECF No. 83-3 ("Sterl Report"). Sterl visited Eden Park in July 2018, took measurements, evaluated the space, and photographed the property. Months later, Sterl's Report concluded that Balbed's bedroom was in fact a cellar (requiring a license under local law), and that the bedroom failed to meet the emergency egress requirements of Montgomery County's Building Code. *Id.* at 1–2.

Defendants, meanwhile, attempted to reconstruct their records by accounting for the costs of Balbed's room and board. To this end, Defendants retained Christine Limparis, a certified public accountant, who reported on the "monthly housing and living cost allocation for the Inn-keeper of Eden Park for the period July 2015 through June 2016." ECF No. 84-13 ("Limparis Report") at 4.[2] Ultimately, Limparis concluded that "the combined total monthly housing and living costs allocated to the Inn-keeper [wa]s $993 in 2015 and $829 in 2016." *Id.* Limparis considered, among

---

[2] Citations to the "Limparis Report" correspond with the ECF pagination.

other things, the cost of Balbed's personal living space, her use of common areas, and "non-property costs" allegedly paid by Eden Park for Balbed's use (i.e., groceries, toilet paper, soap, etc.). *Id.* at 4–6.

The parties renew their cross-motions for summary judgment with this additional discovery in hand.

## II.

Under Federal Rule of Civil Procedure 56(a), the Court will grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In reviewing a motion for summary judgment, the court draws all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. When reviewing cross-motions for summary judgment, each motion is to "be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## III.

### A. Balbed's Compensable Hours

The Fourth Circuit remanded this case with instructions to determine Balbed's hours by first assessing whether the Agreement was reasonable under § 785.23 in light of all "pertinent

facts." *Balbed*, 881 F.3d at 292. Unsurprisingly, the parties have responded with wildly different versions of her compensable hours. Defendants claim the Agreement reasonably required just 29 hours of work per week and that, even then, Balbed was frequently paid "to do nothing" because the rooms at Eden Park were often vacant. Apparently, Balbed also was not expected to clean rooms until guests checked out of Eden Park, meaning that for most weeks 29 hours was a generous estimate of her time. Balbed, on the other hand, represents that she effectively managed Eden Park on her own and that she was "on-call" at all times, causing her to work a minimum of 71 hours per week under the Agreement.

Given the factual issues in dispute, final determination of the hours Balbed actually worked must be decided by the trier of fact.[3] Critical to that finding will be assessing whether Balbed was actually engaged to wait (compensable) or waited to be engaged (not compensable) each day from 4:00 p.m. to 10:00 p.m., during which she supposedly checked guests in and closed Eden Park. The trier of fact will also need to consider whether Balbed spent any additional time performing activities that were not explicitly set forth in her work schedule, such as managing Eden Park's presence on social media.

### B. Wage Credit for In-Kind Benefits

#### 1. Lodging

While the parties skirmish over the actual hours Balbed actually worked, the main point of contention is whether her lodging was furnished "in violation of . . . local law, ordinance or prohibition." 29 C.F.R. § 531.31. Balbed alleges two violations: (1) Defendants' failure to obtain a permit for a cellar bedroom, and (2) their failure to comply with Montgomery County Building

---

[3] Because it remains to be seen whether the Agreement was reasonable, the Court defers decision on the issue of whether § 785.23 obviates the need to assess liability for overtime under the FLSA and the extent to which, if at all, § 785.23 preempts state and county law.

Code, specifically its provisions regarding emergency egress. The more important of the two is whether Balbed's lodging violated the Building Code.[4]

Distilled to its essentials, Balbed's claim is that her bedroom window was too small and too far from the ground to comply with Montgomery County Code ("MCC") § 8-14(a), which provides that:

> [T]he ICC International Building Code . . . is the basic County building code. The . . . use, location, occupancy, and maintenance of all buildings and structures or parts thereof, on-site access facilities to buildings and structures, and their service equipment *must meet the standards and requirements in that Code*, or as amended under Section 8-13.

MCC § 8-14(a) (emphasis added). Accordingly, Balbed argues that her bedroom violated International Building Code ("IBC") §§ 1030.1–1030.3, which require "emergency escape and rescue openings," with "a minimum net clear opening of 5.7 square feet," "not greater than 44 inches measured from the floor." *Id.* Balbed submits that these specifications were not met.

She relies on the findings of her expert, Scott W. Sterl, an architect; who concluded in the Sterl Report that Balbed's bedroom window contained a "clear opening for egress" of only 3.18 square feet, less than the required 5.7 square feet. Sterl Report at 1 (citing IBC § 1030.2). The Sterl Report also found that Balbed's windowsill stood 64 inches tall, above the maximum allowable height of 44 inches. *Id.* (citing IBC § 1030.3). In other words, Balbed's bedroom appears to have failed to meet the requirements of the International Building Code and, by extension, the Montgomery County Code.

Defendants do not squarely address whether Balbed's lodging in any respect violated the International Building Code. *See* ECF No. 84. Rather, they suggest that the Building Code itself does not apply because Eden Park is located in Takoma Park, which implicitly was not and is not

---

[4] The parties devote considerable ink to the issue of whether a rental permit was required for using Balbed's bedroom. However, given Defendants' clear violation of the Montgomery County Code, this issue is academic.

bound by the Code. As support, Defendants reference letters they received from the Montgomery County and Takoma Park governing authorities, advising that Takoma Park retained jurisdiction over *rental licensing* within its limits and that no license was required. *See* ECF No. 84-15 (Takoma Park letter stating that Eden Park was "not required to obtain a rental housing license from the City of Takoma Park"); ECF No. 84-16 (Montgomery County letter stating that Eden Park "needs to be licensed by the City of Takoma Park"). The Montgomery County letter, however, makes no mention of Montgomery County's Building Code. Similarly, and neither the Takoma Park letter nor the City of Takoma Park Code indicates that Takoma Park properties are exempt from the Montgomery County Building Code.

Indeed, a close examination reveals that the Montgomery County Building Code applies to "all buildings" within the County. MCC § 8-14(a); *see also id.* § 8-1 ("This Chapter applies to existing . . . buildings and structures in the County."). The Montgomery County Code also contains an appendix entitled "County Laws Applicable to Municipalities," which indicates that Chapter 8—i.e., MCC § 8-1 *et seq.*—applies to Takoma Park. *See id.* App'x F (table). Beyond this, "in 2000, Maryland adopted the International Building Code [IBC] as its *state-wide model building code*." *Rice v. SalonCentric Inc.*, No. 18-cv-1980, 2020 WL 42760, at \*4 (D. Md. Jan. 3, 2020) (emphasis added).

Moreover, as Balbed notes, Defendants have not factually disputed that her bedroom failed to meet the emergency egress requirements of the International Building Code. That, in the Court's view, is dispositive. The Court concludes that Defendants lack any basis in law or fact to refute the conclusion that Balbed's room was furnished in violation of Montgomery County Building Code. The Court finds that Balbed's lodging failed to comply with local law and, in consequence,

9

Defendants may not claim wage credit for its value.[5] To that extent, the Court **GRANTS IN PART** and **DENIES IN PART** Balbed's Motion for Summary Judgment and **DENIES** Defendants' Cross-Motion.

This determination comports with the findings of numerous courts across jurisdictions that have strictly enforced § 531.31 following infractions similar to those found here. *See, e.g., Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 712 (E.D.N.C. 2009) (failure to comply with state inspection requirements); *Soler v. G & U, Inc.*, 768 F. Supp. 452, 467 (S.D.N.Y. 1991) (migrant house operated without permit); *Severino v. 436 W. LLC*, No. 13-cv-3096, 2015 WL 12559893, at *6 (S.D.N.Y. Mar. 19, 2015) (apartment unit provided in violation of state housing law). The laws violated in the present proceeding were intended to protect occupant safety in the event of an emergency. Clearly, when furnishing in-kind benefits, employers have a duty to comply with laws ensuring the health and wellbeing of their employees.[6]

### 2. Non-Property Costs

Although Defendants may not claim wage credit for her lodging, Balbed clearly received other in-kind benefits such as internet access, groceries, toiletries, and linens. Limparis Report at 8. For these "non-property costs," as described in the Limparis Report, Defendants are entitled to

---

[5] The Court rejects Balbed's notion that the Agreement should be deemed presumptively unreasonable because lodging credit is unavailable. 10/14/2020 Hr'g Tr. 42:23-24. The fact that Defendants may not claim wage credit for the value of Balbed's lodging does not automatically invalidate the number of compensable hours assigned to Balbed's tasks in her work schedule. At trial, Balbed will still have the opportunity to introduce evidence that her schedule in fact provided for an unreasonably short amount of time for her to discharge her duties. The same may be said as to Balbed's argument that the Agreement is unreasonable because it is too ambiguous as to the hours required of her.

[6] The Court cannot help but wonder whether an all too rigid application of § 531.31 could lead to absurd results. As the Court remarked at oral argument on the renewed motions for summary judgment:

> Suppose there were a local regulation that said that housing must provide an excessive number of square feet, a feather down pillow, a soft mattress, shower, jacuzzi, and so on. Obviously, that would be more than adequate, but it would violate local law if that's what the local law said. Is there no limit to what local law can say?

10/14/2020 Hr'g Tr. 32:20-25. Of course there has to be a limit. The case at bar, however, does not generate that issue.

some offset so long as their records "enable . . . [an] authorized representative to verify the nature of the expenditure and the amount by reference to the basic records." *Balbed*, 881 F.3d at 291 (quoting 29 C.F.R. § 516.27(a)(2)).[7]

As permitted by the Fourth Circuit, Defendants have attempted to reconstruct their records by way of the Limparis Report. *Id.* According to the Report, to calculate non-property costs allocable to Balbed, as innkeeper, Limparis starts with Eden Park's tax returns, which list the inn's total relevant expenses: $15,302 in 2015 and $16,884 in 2016.[8] Limparis Report at 8. Limparis then assumes that a portion of these non-property amenities was provided to Balbed, as the innkeeper, as well as to Eden Park guests. Limparis further assumes that Balbed enjoyed the amenities 365 days a year, whereas the guests enjoyed them for 2,076 days, a total of 2,441 days (365 + 2,076). *Id.* at 4–5. To calculate the ratio of Balbed's enjoyment of the amenities compared to that of Eden Park's guests, Limparis divides innkeeper days by the total number of guest days (365/2441 = 0.149), rounded off to 15%—the amount that Limparis concludes is attributable to Balbed as the innkeeper. Applying that percentage (15%) to Eden Park's total expenses—$15,302 in 2015 and $16,884 in 2016—results, according to Limparis, in annual non-property expenses attributable to Balbed of $2,295 and $2,533, respectively, for tax years 2015 and 2016, or $191/month and $211/month ($43.95/week and $48.56/week).[9] *Id.*

---

[7] The Court rejects Balbed's argument that she never agreed to wage deductions, as ordinarily required under Maryland law, and that they therefore should not be counted. Balbed unequivocally entered into a bargain in which she agreed to trade services for $800 cash plus various in-kind benefits. The fact that the in-kind benefits were provided "at no cost" is not to say that the benefits had no value. Moreover, no deduction from wages is involved here, simply an evaluation of whether Defendants should get any credit for the benefits provided to Balbed over and above the $800 cash wage.

[8] Eden Park's total non-property expenses were calculated by adding reported expenses for "Supplies" and "Telephone Communication" listed on Eden Park's Form 1040, Schedule C for 2015 and 2016. *See* Limparis Report at 9–12. "Supplies" are described as including "linen [sic], groceries, drink, bathroom/paper and tissues, cleaning products, hair/body products." *Id.* at 8. "Telephone Communication" is described as "Phone/internet." *Id.* The only documentation detailing the expenses is a brief note from B. Mukendi describing certain expenses in more detail. *See id.* at 20.

[9] As suggested by Limparis, weekly costs can be calculated by dividing monthly costs by 4.345. *See id.* at 1.

As Balbed notes, there is reason to question the adequacy of Defendants' reconstructed costs. The Fourth Circuit has emphasized that the records should "include itemized accounts showing the nature and amount of any expenditures entering into the computation." *Balbed*, 881 F.3d at 290 n.3 (quoting 29 C.F.R. § 516.27(a)(1)). Here, Defendants' records are not itemized; Limparis's calculations have been taken wholesale from Eden Park's 2015 and 2016 tax returns. It does not appear that Limparis independently verified any costs. Moreover, the only more or less specific substantiation provided is by way of notes submitted by Defendant B. Mukendi detailing certain expenses. Perhaps that is the best reconstruction possible under the circumstances. Nevertheless, Balbed will have an opportunity to prove at trial that Defendants' cost allocations are not reasonably reconstructed and that Limparis's analysis is flawed.[10] But, even Balbed acknowledges, "[w]hether or not Defendants have provided a reasonable reconstruction of their records . . . is a question of fact that must be resolved by the fact-finder." ECF No. 87-1 at 15–16. The Court agrees. The parties will therefore be put to their proof.

For now, at any rate, the Court understands that between July 2015, when Balbed's work commenced, until October 2015, if Balbed worked 29 hours per week and all non-property costs reported by Limparis are credited to Defendants, Balbed would have received $243.95/week ($200 cash + $43.95 in-kind benefits), which would be just over the Montgomery County minimum wage ($8.40/hour, $243.60/week), the Maryland minimum wage ($8.25/hour, $239.25/week), and the federal minimum wage ($7.25/hour, $210.25/week). Whether or not Defendants are obligated to pay these wages depends on the compensable hours Balbed worked and whether Defendants have

---

[10] The Court notes, for instance, that Limparis apparently bases her analysis on a 365-day year for Balbed, though in fact Balbed only worked for some 6 months in 2015 and 1 month in 2016.

reasonably reconstructed their non-property costs and their expert's analytical assumptions are deemed sound.[11] Both are questions for the jury.

All this said, while Balbed's hours and the adequacy of Defendants' records and analysis await determination by the trier of fact, no further findings are necessary with respect to Defendants' failure to pay the Montgomery County minimum wage between October 2015 and January 2016. That is because, even assuming Defendants are credited with the full value of all non-property costs, as claimed by their expert, Balbed would have been paid less than the minimum wage. To be specific:

In October 2015, the Montgomery County minimum wage increased from $8.40/hour to $9.55/hour. *See Balbed*, 881 F.3d at 288 n.1. If Balbed worked just 29 hours per week, she was owed a wage of $276.95/week ($9.55 x 29 = 276.95) from October 2015 until the end of her employment in January 2016. Excluding lodging credit, as the Court has ruled, the only offsets available to Defendants would be the value of non-property costs: $43.95/week in 2015 and $48.56/week in 2016. In other words, added to $200 in cash wages, Balbed's total weekly pay would have been $243.95 and $248.56 as opposed to $276.95, the differential being a deficit of $33/week in 2015 and $28.39/week in 2016. The Court concludes that, at least to that extent, Balbed's wages were below the Montgomery County minimum wage from October 2015 to January 2016. As such, partial summary judgment is **GRANTED** to Balbed with respect to the Montgomery County minimum wage during that limited period.

---

[11] The same is true as to violations of the Maryland and federal minimum wage laws from October 2015 to February 2016. With full credit for non-property costs as deemed by Limparis, Balbed was paid the minimum wage under both regimes. However, without any wage credit given to Defendants, she was not.

**IV.**

B. Mukendi and T. Mukendi have moved for summary judgment on the issue of their individual liability. Under the FLSA and MWHL, courts assess such individually-targeted claims using the "economic reality" test. *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689 (D. Md. 2010). Based on the totality of the circumstances, the court weighs whether the individual (1) has authority to hire and fire employees; (2) supervises and controls work schedules or conditions of employment; (3) determines the rate and method of payment; and (4) maintains employment records.

According to Defendants, E. Mukendi was the only individual with authority to hire and fire; she controlled Balbed's work schedule, compensation, and terms of employment. However, Balbed points to evidence that B. Mukendi was a co-owner of Eden Park. He helped convert Eden Park from a sole proprietorship to an LLC, was "responsible for maintaining the property," and sought permits for the facility. *See, e.g.*, B. Mukendi Dep. 47–52, ECF No. 84-5. When E. Mukendi was unavailable, B. Mukendi allegedly stepped in her shoes. B. Mukendi also testified on deposition that Balbed would have consulted him about her compensation. *Id.* at 164:10-15, ECF No. 87-4. In sum, Balbed has raised disputed, genuine issues of material fact that render summary judgment in favor of B. Mukendi inappropriate. B. Mukendi's Cross-Motion for Summary Judgment is therefore **DENIED**. He, too, must be put to his proof at trial.

Whether T. Mukendi can be individually liable presents a closer question. Defendants insist that T. Mukendi has no (and implicitly never had an) ownership interest in Eden Park, played "no role whatsoever" in hiring Balbed, did not control Balbed's employment, and only provided limited training to Balbed. On the other hand, Balbed insists that T. Mukendi gave her specific instructions about what tasks she was to perform and how to perform them and also communicated

14

with Balbed about changes in her compensation. Although the factual support for individual liability against T. Mukendi appears thin, at this phase the Court must view the evidence in the light most favorable to Balbed. Granting summary judgment in favor of T. Mukendi would require the Court to improperly weigh the evidence. T. Mukendi's liability *vel non* is for the jury to decide. Accordingly, her Cross-Motion is **DENIED**.

### CONCLUSION

For the foregoing reasons, Balbed's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** and Defendants' Cross-Motion for Summary Judgment is **DENIED**. Since the Court's rulings do not resolve all claims and damages, the parties shall prepare for trial. A Pre-Trial Conference will be held on May 25, 2021 at 3:00 p.m. Counsel should consult the Local Rules regarding the preparation of a Pre-Trial Order.

A separate Order will **ISSUE**.

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

April __, 2021